UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-036 (SRN/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S |
| v. | ) | SENTENCING POSITION |
| | ) | |
| HURIAH KAREEM BLEDSOE, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Huriah Kareem Bledsoe spent his childhood living in some of the worst neighborhoods in America. Growing up in the poverty-stricken South suburbs of Chicago, violence and drugs were everywhere—in his home, his school, and his neighborhood. Mr. Bledsoe could not escape it.

Mr. Bledsoe was the third of four children born to a single mom. The family was poor. They lived in either apartments or public housing, and twice lived in a homeless shelter. The family was always on food stamps, but even then, there typically was not enough food around the house. Despite this, Mr. Bledsoe's mother seemed to always take care of her daughters. She made it a priority to provide for them—to feed and clothe them. However, from a very young age Mr. Bledsoe was told to "be a man."

1

Left to provide for himself while still a child, Mr. Bledsoe began going door-to-door doing household chores for money. When the family moved to a more dangerous neighborhood however, he could no longer do this. Instead, he took what he thought to be a caring neighbor up on his offer to sell the only thing around: drugs.

Unbeknownst to Mr. Bledsoe, this desperate decision made decades ago served as a turning point in his life and began a cycle that was difficult to break. When he found himself without work, he turned to what he knew – selling drugs – as a way to support his children and his cancer stricken mother. These criminal actions leads Mr. Bledsoe to this Court.

Today, Mr. Bledsoe stands before this Court facing a longer prison sentence than ever before. He plead guilty to possession with the intent to distribute controlled substances and being a felon in possession of firearms. His advisory guideline range is 110 - 137 months. The plea agreement prohibits the government from requesting a sentence greater than 197-months and the defense from requesting a sentence lower than 120-months. This potential sentence has served as a wake-up call for Mr. Bledsoe. He acknowledges that he made some bad decisions and that those decisions have caused his family incredible pain, since they will now have to live without him for years. More importantly, however, Mr.

Bledsoe recognizes that if he does not change his actions upon release, he will likely spend the rest of his life in prison.

With this, Mr. Bledsoe respectfully asks the Court to impose 120 months' imprisonment followed by three years of supervision. This is a reasonable sentence in light of the § 3553(a) factors, and to accomplish the sentencing goals set forth in 18 U.S.C. § 3553(a). Certainly, Mr. Bledsoe has committed a serious crime that is deserving of punishment, but not a punishment beyond reason. It the Court imposes the requested sentence, Mr. Bledsoe will be nearly fifty when he is released. Thus, a sentence of ten years (almost triple the longest sentence he has ever served) would be sufficient but not greater than necessary under the circumstances, and it would fairly acknowledge the history and characteristics of Mr. Bledsoe, the offense conduct, and protect the public.

## SENTENCING ANALYSIS

I.    **18 U.S.C. § 3553(a) FACTOR SUPPORT A 120-MONTH SENTENCE**

A. **The History and Characteristics of Huriah Kareem Bledsoe**

As stated earlier, Mr. Bledsoe was the third of four children born to a single mom. He met his father once when he was three years old and never saw him again. When Mr. Bledsoe was about six, his mother, Shirley Morris, married another man. This man argued with and physically assaulted Ms. Morris, which

3

Mr. Bledsoe saw and heard on a regular basis. Ms. Morris ended the relationship a few years later.

After this relationship ended, Mr. Bledsoe's mother was back to being a single mom, raising four kids in the South suburbs of Chicago. The family was poor, but so were most people in the neighborhood at that time. His mother worked long hours and was not around often. This left Mr. Bledsoe and his sisters home alone often, even from an early age. While his sisters were typically provided for, he was left to fend for himself.

So, at age seven, while most boys are riding bikes and learning to read, Mr. Bledsoe started "being a man" and working to provide for himself. He began going door-to-door around his neighborhood looking for work. He would ask his neighbors if they needed any yardwork or cleaning done in exchange for money. His work ethic is emphasized by each of the collateral contacts in Defense Exhibit 1. Mr. Bledsoe would give half the money he earned to his mom for safe keeping. At one point, he was saving up for a new pair of shoes. When he thought he had enough money saved to buy them, he asked his mom for the money. She didn't have it. She had spent it.

At age twelve, his family moved to the nearby suburb of Ford Heights, which was deemed "the poorest suburb in America" just a few years earlier.[1] The median household income in Ford Heights, Illinois in 1990 was $14,032.[2] One area of Ford Heights in particular was known locally in the 1990s as "Vietnam," since gunshots were heard nightly.[3]

Mr. Bledsoe's problems followed him here. He was not being provided for at home. He was still surrounded by poverty, and he was still hungry. But in this neighborhood, he could not go door to door looking for work because the area was so dangerous.

It seemed like things were finally looking up when a neighbor began to take interest in Mr. Bledsoe's wellbeing. This neighbor brought Mr. Bledsoe under his wing and provided him an opportunity to make the money Mr. Bledsoe desperately needed. However, this neighbor was a drug dealer, and this "opportunity" required Mr. Bledsoe to sell drugs. At age twelve, knowing only

---

[1] Dirk Johnson, *The View from Poorest U.S. Suburb*, The New York Times, Apr. 30, 1987, last accessed Feb. 11, 2020 at 10:53 am, https://www.nytimes.com/1987/04/30/us/the-view-from-poorest-us-suburb.html.
[2] United States Census Bureau, *1990 CPH-L-126 Median Household Income for Places with a Population of 2,500 to 9,999, Ranked Within the United States: 1989*, last accessed Feb. 11, 2020 at 10:57 am, https://www.census.gov/hhes/www/cphl126h.html.
[3] Chicago Tribune, Rudolph Bush, *End of grim era in Ford Heights*, last accessed Feb. 11, 2020 at 10:59 am, https://www.chicagotribune.com/news/ct-xpm-2003-10-17-0310170456-story.html.

that he was hungry, that he had to fend for himself, and that his prior efforts weren't working, he did it.

Unbeknownst to Mr. Bledsoe at the time, this served as a turning point in his life. This encounter brought Mr. Bledsoe into the folds of the world of drugs and violence that he had only observed from the sidelines prior to this point.

The violence that was present in Mr. Bledsoe's life plagued his school experience as well. Since Mr. Bledsoe did not have many friends, brothers, or father figures in his life who could protect him, he was a target for bullies. He was jumped several times on the way to school, during school, and on the way home from school.

To make matters worse, in fifth grade, Mr. Bledsoe was diagnosed with a learning disorder. While he liked school, especially science and reading, he received poor grades and was moved away from his classmates to an alternative school—Bloom Township Alternative High School. While this school may have been intended to help students with learning disabilities, it did nothing of the sort.

Mr. Bledsoe had class in the same room all day, every day. Students were not allowed to leave this room, even for lunch. Instead, lunch was delivered to the room, and the students were not given any other breaks. Mr. Bledsoe recalls that during the school day, it was not uncommon for a student to act out. Usually the teacher or supervisor of the room would try talking to the student, but if that didn't

work—which it usually didn't—the supervisors would pin the student to the floor until he or she calmed down.  If the student could not be physically controlled, he or she would be taken to the "glass room" where the student sat alone for the remainder of the day. Although never subjected to this himself, Mr. Bledsoe watched this happen repeatedly to his classmates.

To make matters worse, Mr. Bledsoe was still struggling with his learning disability. Although he had been formally diagnosed with attention deficit disorder (ADD) years prior, he was never given the assistance he needed. His mother refused to acknowledge what teachers had told her for years—that Mr. Bledsoe needed special accommodations. At one point, Mr. Bledsoe was even prescribed mediation, but his mother would not pick it up because she did not like how the medication made him act.

These conditions made Mr. Bledsoe feel unsupported and unsuccessful. But in addition to an unaddressed learning disability and a violent, dysfunctional school, he did not fit in with the other kids. Since his family was poor, Mr. Bledsoe had to wear the same clothes and shoes day after day because his family couldn't afford to buy him more. Especially as a teenager, this embarrassed Mr. Bledsoe. All of this together was more than he could take, and finally in eleventh grade, he stopped attending class entirely.

At sixteen, Mr. Bledsoe and his family moved to the nearby suburb of Sauk Village. Here, Mr. Bledsoe started selling drugs full time. As a teenager having grown up in neighborhoods and households where drug activity was prevalent, this wasn't seen as "bad." Rather, the drug dealers in the area, like Mr. Bledsoe's previous neighbor, sometimes served as role models for children, because it seemed they could actually provide for themselves and others. This is what Mr. Bledsoe thought he wanted.

He quickly realized that selling drugs was how he could make a lot of money, fast. With this money he made, he assumed the role as provider for the family, even though no one had taken on that role for him. He made sure the kitchen was stocked with food, and most importantly to Mr. Bledsoe, he made sure that his mother was provided for. With this, Mr. Bledsoe had found a way to become the man he was always told to be.

While this lifestyle offered some benefits in Mr. Bledsoe's eyes, it also came at a price. At the age of eighteen, Mr. Bledsoe was the victim of a random act of violence and was shot in the leg. In addition to this, Mr. Bledsoe has also witnessed an incredible amount of violence. Seven of Mr. Bledsoe's friends were murdered within a three-month span.

It was not long before this lifestyle brought him into the folds of the criminal justice system, and has served as a revolving door ever since. Although Mr.

8

Bledsoe initially did well after his release, the combination of not having a high school diploma and having a felony record proved extremely challenging to navigate. It was not uncommon for Mr. Bledsoe to be hired for a job, work for a few weeks until his background check came back, and then be let go. Eventually, this became discouraging, and Mr. Bledsoe returned to his "old ways" of selling drugs.

The Supreme Court has noted, "A stable, loving homelife is essential to a child's physical, emotional, and spiritual well-being." *Santosky v. Kramer*, 455 U.S. 745, 788-89 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, J., dissenting). Children who do not grow up in such an environment ". . . generally face extraordinary problems developing into responsible, productive citizens." *Id. See also United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood—at some level of severity—can impair a person's mental and emotional conditions").

Given this recognition, district courts commonly consider the circumstances of a defendant's childhood and grant sentencing reductions where a defendant was victimized as a child, witnessed abuse, grew up in poor economic circumstances, or was otherwise exposed to extreme drugs, violence, and

poverty.[4] Still a child, Mr. Bledsoe did not have the tools or resources to provide for himself, which ultimately led him to turn to selling drugs. This fateful decision, made out of desperation, served as the introduction into a habit that was difficult to put an end to. Now, Mr. Bledsoe stands before this Court facing more time than ever before and realizes that he must make a change.

Around 1998, Mr. Bledsoe met Erika Burgess. Erika's father is currently the mayor of Sauk Village, Illinois and the two of them came from completely different worlds. Despite this, however, they hit it off instantly. Erika provided Mr. Bledsoe with stability, and in 2001, Mr. Bledsoe became a father for the first time. Their oldest son is on a football scholarship at Missouri Southern State University. Mr. Bledsoe is so proud and thankful that his son did not follow the path Mr. Bledsoe went down so many years ago.

---

[4] *See, e.g., United States v. Samuels*, 2009 WL 875320 (S.D.N.Y. Apr. 2, 2009) (imposing time served sentence rather than Guideline range of seventy to eighty-seven months where defendant "was raised under poor economic circumstances with an abusive father addicted to crack"); *United States v. Patzer*, 548 F. Supp. 2d 612 (N.D. Ill. 2008) (imposing 13 years despite Guidelines range of 346-411 months in career offender case, partly in consideration of defendant's difficult childhood with an abusive family and undiagnosed ADHD); *United States v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (granting variance based on defendant's upbringing where he frequently witnessed domestic violence and substance abuse by his parents until his grandmother took custody of him at age five); *United States v. Wyatt*, 442 F. Supp. 2d 298, 299 (W.D. Va. 2006) (imposing mandatory minimum sentence of 60 months (a 61-month downward variance) in methamphetamine manufacturing case where defendant had suffered depression and anxiety since age fourteen due to accidental death of her younger brother and two close friends).

He and Ms. Burgess had three more children over the next four years. Since she worked outside of the house, Mr. Bledsoe stayed at home and cared for the children when they were young. He cooked and cleaned for his family of six, and was known for his story telling. He provided for his children the way he wished he would have been. During this time, things were stable for possibly the first time in Mr. Bledsoe's life. Ms. Burgess provided counsel with a statement in regards to Mr. Bledsoe character; the statement is attached as Defense Exhibit 1.

While things with Ms. Burgess were good in the beginning, after several years together the relationship that had brought so much love and stability into Mr. Bledsoe's life ended. Mr. Bledsoe started spending time with people he should not have and returned to the drug life. The couple did not last, but are friends today and co-parent.

In 2012, things started to look up for Mr. Bledsoe, as that is when he met his current girlfriend, Michelle Hall. Despite having six children of his own by this time, Mr. Bledsoe took Ms. Hall's children in as his own. Over the years, he acted as a father figure to them—teaching them things like how to tie their shoes and how to do their math homework.

When Ms. Hall's daughter was hospitalized for severe asthma, Mr. Bledsoe even stayed with her, and slept there every night. Also, when Ms. Hall was incarcerated for nearly two months over Thanksgiving and Christmas, he cared

11

for all four of their combined children. He took the kids to school, did the girls' hair, and did all the day-to-day duties by himself, on top of handling all of the holiday festivities. This relationship with Michelle is ultimately what made Mr. Bledsoe leave the Chicago area. After one of her friends was shot in the driveway, the couple decided to come to Minnesota because it is safer.

Mr. Bledsoe was determined to provide a different life for his children than the one he had. He has made sure that his children are cared for. Even now, Mr. Bledsoe makes sure that his now eight children have everything they need—a safe place to live, food on the table, and clothes to wear—everything that he did not have himself. More importantly, however, Mr. Bledsoe has instilled in his children that they should not follow in his footsteps. He recognizes the life he has lived was not one to repeat, and has tried to prevent the underlying cause that led him to turn to a life in the streets: severe poverty, desperation, and abandonment.

In addition to caring for his children, Mr. Bledsoe has also cared for his mother. His mother has had two rounds of cancer, one in 2012 and another in 2016. Both times, Mr. Bledsoe did not want his mother to be alone, so he uprooted his life and moved down to Georgia to help care for her. He took her to her doctor appointments, cooked for her, washed her clothing, divided up her medicine, and helped her grease her hair when it started to fall out from the chemotherapy. Mr. Bledsoe also financially provided for his mother. He helped his mother get her

lights turned back on, bought her a truck, paid for people to mow her yard, and provided anything she needed.

Mr. Bledsoe remains close to his family and speaks with them on a weekly basis. Although his mother remains supportive of him, Mr. Bledsoe has noted that she is disappointed in his life choices. Both this strong relationship with his mother and the relationship Mr. Bledsoe has with Michelle Hall gives him hope for the future. They remain together and communicate multiple times a week, which often includes video visits. Although all of his family has remained supportive, they are very disappointed and surprised by his January 17, 2019 actions.

### B. Offense Conduct

On January 17, 2019, law enforcement executed a search warrant at a hotel room. Inside the hotel room, Mr. Bledsoe was watching TV along with his girlfriend's children. Firearms were hidden inside a closet and drugs were stored in a duffel bag. There was some marijuana that was out in the open. In total, five firearms, and around 16 grams of methamphetamine, 4 grams of heroin, and 16 grams of crack cocaine were located. Certainly, the low quantity of drugs is very uncommon in federal court, and as such the base offense level is 24. After the execution of the search warrant, Mr. Bledsoe was arrested and has remained in custody since that time.

Unfortunately, this is not Mr. Bledsoe's first drug offense. Twenty-one years ago at age 19, he admitted to possessing drugs and soon thereafter, he admitted to possessing user amount of marijuana. So why did this criminal act occur now that he is aged 40? The answer is simple – Mr. Bledsoe needed money because of his mother's illness and resorted to what he has known to do since a young age – sell drugs. The firearms in this case was unusual for Mr. Bledsoe, but he possessed the firearms for less than 24 hours with the understanding they too were going to be sold for cash. Given the offense conduct, how much time should Mr. Bledsoe serve behind bars? Weighed against other 3553(a) factors, Mr. Bledsoe again requests a sentence of no more than ten years.

### C. Deterrence and Public Safety

Another 3553(a) factor the Court must consider is deterrence and the public safety. In United States Department of Justice's report *Five Things About Deterrence*, May 2016, the National Institute of Justice summarized a large body of research related to deterrence and made two significant findings.  First, the article explains that evidence shows "sending an individual convicted of a crime to prison isn't a very effective way to deter crime. ... [p]rison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes."

Second, and in concert with this evidence, the National Institute of Justice submits that "increasing the severity of punishment does little to deter crime ... [because of] [t]he lack of any 'chastening' effect from prison sentences, [t]hat prisons may exacerbate recidivism, [t]he different impacts of the certainty versus the severity of punishment on deterrence, and [t]hat individuals grow out of criminal activity as they age." *Id*. Recidivism is discussed below.

Thus, as the study explains, sending Mr. Bledsoe to prison for a long period is not an effective way to deter his criminal conduct or the conduct of others.  And there can be no doubt, as an offender ages, the rate of recidivism decreases. Research has shown that individuals like Mr. Bledsoe are much less likely to recidivate upon their release from prison when they are older.

If there is any doubt about Mr. Bledsoe's recidivism upon release, he will still be under the jurisdiction of the federal courts for at least three years.  This is good for a number of reasons:

1) Mr. Bledsoe will be able to get the housing and community support he needs from United States Probation Department and hopefully with the Court's reentry program;

2) He will have the support of his family;

3) A term of supervised release will ensure that Mr. Bledsoe is drug- free and employed when he is actually living in society again;

4) The extra accountability will ensure that Mr. Bledsoe establishes a stable and strong, law-abiding life that will keep him from returning to prison; and

5)     This go around will be different because of Mr. Bledsoe's desire to do better and he will be older.

In sentencing him, Mr. Bledsoe asks the Court to consider that he does not need a lengthy sentence for the purpose of deterrence, and three years of federal supervised release will ensure Mr. Bledsoe's success. Also, keeping in mind a ten-year sentence is almost three times more than he's ever served.

In regards to public safety, it is important to note that his prior drug offense occurred almost twenty-one years ago. He has no prior gun offenses. His record does include assaults, but that concern can be remedied by giving Mr. Bledsoe much needed therapy and treatment. With special supervisions conditions, the Court can be assured that Mr. Bledsoe will not add to his criminal history.

### D. Criminal History

Mr. Bledsoe finds himself in criminal history category VI. The PSR in Section B sets out Mr. Bledsoe's criminal history. Fifteen years ago, at age 26, Mr. Bledsoe admitted to his first serious felony. He admitted that he assaulted his then girlfriend R.A. For that offense conduct, Mr. Bledsoe receives 5-criminal history points because it was an assault case. (PSR, ¶ 44). Mr. Bledsoe and R.A. share one child together. Mr. Bledsoe keeps in contact with his son. At age 31, Mr. Bledsoe admitted to a misdemeanor assault with his then girlfriend T.J. The two kept in contact after the assault, and as such, Mr. Bledsoe was charged with violating no

contact orders in 2011 and 2013. The last no contact order violation was a felony conviction because of the priors. At no time were the violations based on new assaultive behavior.  In 2016, Mr. Bledsoe admitted pushing his current girlfriend, MH. He was given 18 days in jail. MH and Mr. Bledsoe are together today. Mr. Bledsoe knows he has anger issues and wants to get "real" treatment when he is released from prison. As discussed below, he is receiving medication while in custody, but feels he will benefit from seeing a therapist. As discussed earlier, he witnessed domestic assault as a child and witnessed and was a victim of physical assaults throughout his life. Given his background, it is clear he learned bad behavior and has anger issue. Fortunately, it is clear that Mr. Bledsoe has maintained healthy relationships with his children and in his current relationship. This is evidenced by Defense Exhibit 1.

Finally, it is important to note that Mr. Bledsoe has no prior firearm cases and his only felony drug conviction is from 21 years ago. The longest sentence he has served in prison was 40 months (a 60 months sentence but with good time he served 40 months). This occurred almost 15 years ago. (PSR, ¶ 44).  If the Court is looking at a graduated prison sentence, Mr. Bledsoe is certainly receiving a large sentence if he is given ten years to serve.

### E.  Mr. Bledsoe has a statistically low recidivism rate upon release

Mr. Bledsoe is currently 40 years old. If he were sentenced to 120 months, he would be approximately 50 when released (not taking into account any potential good time). Given his expected age at release and his current education level, Mr. Bledsoe's risk of recidivism is statically low. This low recidivism rate, paired with Mr. Bledsoe's acknowledgement that he needs to change, satisfies the balance that is required by 18 U.S.C. §3553 that the sentence is sufficient, but not greater than necessary.

The Sentencing Commission has assessed recidivism statistics based on education and age of release. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, 3 Dec. (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf. Although Mr. Bledsoe dropped out of high school in the eleventh grade, he received his General Equivalency Diploma (GED) in 2007, and attended college courses for culinary arts at Minneapolis Community and Technical College in 2011. (PSR ¶ 117.) This formal education, in addition to his skills in home remodeling, drywall installation, and painting will serve Mr. Bledsoe well upon release, and places Mr. Bledsoe in the second-lowest category of recidivism rate. *Id.* at 24.



*Fig. 17* Rearrest Rate of Recidivism Study Offenders by Education and Age at Release

*Id.* at 24. The lack of training has not been what has prevented Mr. Bledsoe from living a law-abiding life, as he has possessed it for several years. Rather, it has been employers who do not want to hire a felon. We know this attitude is changing and with the help of the United States Probation Office, Mr. Bledsoe can secure employment and therefore provide financially for his family. If that can occur, he will not resort to crime. Plus, he really is deterred from committing crimes because of his age and the potential for a longer prison sentence.

Mr. Bledsoe acknowledges what he did was wrong and that he needs to change. While he recognizes that he initially was selling drugs as a child out of desperation, Mr. Bledsoe also acknowledges that he needs to find what motivated him to continue these actions, and to stop. He stated,

> I admit to the crime. I want to be out with my kids and I know committing crimes will take me away. Knowing how much time I am facing, I know that a large part of my life is being taken away because of me. It scares me. How will the Judge know that I am serious about

> changing my ways? I am getting older, and don't want to spend the rest of my years in prison. Hearing the guys in Sherburne I know that will happen if I don't do better. I see the pain I've caused my family and that's a motivator to change.

(PSR ¶ 11.) Mr. Bledsoe recognizes that with the possible sentence he is facing in the immediate case he is going to lose at least a decade of time with those he loves. Mr. Bledsoe has also realized that any additional sentence after this will likely eliminate any possibility of freedom again in his lifetime. Mr. Bledsoe has expressed interest in undergoing substance abuse treatment as well as mental health counseling if offered at the facility he is placed. These resources, in addition to the love and support he has through his family, will ultimately help him break the cycle.

In addition to the education level of the offender, the Sentencing Commission has focused on the age of the offender, and has found that "recidivism measured by rearrest, reconviction, and reincarceration declined as age increased. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, 3 Dec. (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf. Additionally, older offenders were substantially less likely than younger offenders to recidivate following release. *Id.*

The Sentencing Commission has studied how the age of release affects both reincarceration rates and reconviction rates. As demonstrated below, the percentage of individuals who are reconvicted decreases drastically as the age of the offender increases. Only approximately 15.9% of individuals between the ages of 50 to 54 were reconvicted. *Id.* at 23. Even if the 120-month sentence is imposed, Mr. Bledsoe will be within this category upon his release, and therefore has a statistically low recidivism rate.



*Fig. 14* Reconviction Rates for Recidivism Study Offenders by Age at Release

*Id.* at 23.

In addition to this low rate of reconviction, the rate for reincarceration for offenders in Mr. Bledsoe's age category at his time of release is even lower. The Sentencing Commission's study demonstrated that only 12.8% of individuals between the ages of 50 and 54 at the time of their release were reincarcerated. *Id.*



*Fig. 15* Reincarceration Rates for Recidivism Study Offenders by Age at Release

*Id.* at 23.

Mr. Bledsoe would again fit within this category of statistically low recidivism rate when released, even if the requested 120-month sentence was imposed.

It is not unique for courts to consider both the age of the individual at the time of sentencing, as well as the projected age of the individual at release. *See United States v. Birkett*, 2006 WL 2819663 (37-year-old defendant was convicted of the distribution of cocaine. The court noted that even under the mandatory minimum sentence, he would be close to fifty years old upon release. Given the lowered recidivism rate for people of that age, there is not as strong of a necessity to protect society from future crimes, and thus a shorter sentence may be imposed).

Title 18 U.S.C. § 3553(a) also provides that the sentence imposed must provide the defendant with correctional treatment in an effort to rehabilitate. It is not lost on the courts that the rehabilitation that is valued by the Sentencing Commission is not only an aspect of punishment, but is also for the benefit of the individual. As a result, this rehabilitation is most necessary when the individual has hope for the future and for a life after release. Courts have noted, individuals "cannot be served if a defendant can look forward to nothing beyond imprisonment." *United States v. Carvajal*, 2005 WL 476125, at *6.

Mr. Bledsoe has a life to look forward to after his sentence, and it is this life that has made Mr. Bledsoe realize he needs to change. He is the father of eight children. The oldest is a freshman in college and the youngest is three. Even if the requested 120-month sentence was imposed, Mr. Bledsoe will miss approximately 80 of his children's birthday celebrations, as well as many graduations, holidays, and his eldest son's football games. He will miss seeing his children grow up, but he knows he is to blame and is trying hard to mentally deal with his actions.

### F.  Medical and Mental Health

Mentally, Mr. Bledsoe admits that he has needed help. Ten years ago, he sought help on his own and attended therapy, but it ended due to finances. It also brought some mental health challenges for Mr. Bledsoe. While Mr. Bledsoe cared deeply for his family, he has often prioritized caring for others over caring for

himself. Mr. Bledsoe has struggled with depression and anxiety for years. He turned to drugs in part to self-medicate this depression and anxiety, but also in part because drugs were so prevalent in Mr. Bledsoe's childhood home and neighborhood, it seemed normal. Finally, in 2010, Mr. Bledsoe saw a therapist for the first time and was diagnosed with depression. He is currently taking medication for depression and anxiety. He feels that if he could talk out his problems with a professional it will help him deal with whatever life throws at him.

In regards to physical health, records have not been received from Sherburne County. (PSR, ¶ 108). Throughout counsel's representation of Mr. Bledsoe, he has reported issues surrounding his blood pressure. When he first became an inmate at Sherburne County Jail, he was taking one pill; today he is taking eight pills. The issues have surrounded his blood pressure. Two months ago, he fainted in his cell and a nurse was called in immediately. Mr. Bledsoe said he has been told that the issues surround his level of stress. However, he cannot do much about the stress given his current incarceration.

### G. Drug Use

Not surprisingly, Mr. Bledsoe has used drugs. He began using marijuana at age 14. Four years ago, he feels his drug use took a turn. He began taking opiates, cocaine, crack and marijuana. He really feels that he could not process his feelings

over his mother's illness. He went to Georgia and he could not see the woman he knew as his mother due to her illness. Mr. Bledsoe has only attended treatment once and that was ten years ago. Mr. Bledsoe is willing and wanting to attend chemical dependency treatment.  (PSR, ¶ 115).  He is hoping he can receive treatment in prison, along with vocational and educational training.

### H. Education & Employment

Despite dropping out of high school and having learning disabilities, Mr. Bledsoe has done what he can to provide himself a better way to provide for his children. He received his GED in 2007.  In 2009, through the Goodwill, he obtained his forklift license. He then attended community college for culinary arts. He has learned to remold homes, a skill that he hopes can help him secure a job despite his criminal background. It is important for the Court to know that Mr. Bledsoe has attempted to better himself financially without criminal activity. He needs more direction and with the support of the United States Probation Office, that can happen. For three years, he worked using his construction related skills. He worked as a plaster molder and then remolded homes and apartments for his landlord. He had just moved back to Minnesota when he was arrested and had not yet secured employment in Minnesota. (PSR, ¶ 122). In regards to future employment goals, he wants to return to the construction field or the culinary arts. As stated in some of the statements in Defense Exhibit 1, he likes working with

cars as well, but wants to make enough money to support his family with a stable and "regular" job. He's been thinking quite a bit about his future over the past year since being in custody.

### I. Pretrial Custody

Mr. Bledsoe has been in custody for over a year at the Sherburne County Jail. Since being in custody, he has relied on some video visits from Ms. Hall and his mother. However, due to financial reasons and his mother's health, those visits are not too often. He has experienced medical problems (discussed earlier). He keeps his head down and avoids problems. He has not seen sunshine other than when he has been transported to court. Programming is basically null at Sherburne. He has little mental health help. The time has been hard on Mr. Bledsoe and he is eager to go to prison so he can begin programming and start to map out his future with his family.

### J. Guidelines and Statute

For the amount of drugs, Mr. Bledsoe pled to a C count, which means he is facing a maximum penalty of 20 years. There is no mandatory minimum term. The advisory total offense level for count I is 23. This includes a base offense level of 24, a 2-level enhancement for possessing the firearms (a crime for which he pled guilty to in Count 3) and a reduction for acceptance of responsibility.

In regards to Count 3, Mr. Bledsoe is facing a maximum penalty of 10 years. The advisory total offense level for Count 3 is 25. This includes a base offense level of 22, a 2-level enhancement for the number of firearms, a 4-level enhancement for possessing the firearms in connection with the drugs (a crime for which he pled guilty to in Count 1) and a reduction for acceptance of responsilbility. The PSR concludes the total offense level for both crimes is 25 (the highest of the offense level for both offenses) and the advisory range is 110 to 137 months.

### K. Future

Mr. Bledsoe will continue being a father for all of his children while he is behind bars. He will continue being there emotionally and mentally for each of his children. He will do the same for Ms. Hall and his mother. While in custody, he plans on taking every class and program to better himself.

### CONCLUSION

For the reasons stated above, Mr. Huriah Bledsoe respectfully requests the Court sentence him no greater than 120 months imprisonment followed by three years of supervision. The supervision term will be important, as it will assist Mr. Bledsoe with employment. This crime occurred because of financial hardships – eight children and a mother with cancer. While Mr. Bledsoe acknowledges the seriousness of the crime, a sentence of ten years would be sufficient and would fairly acknowledge the history and characteristics of Mr. Bledsoe, the offense, the

27

financial circumstances that drove him to commit these offenses, and his ability to lead a law abiding life. He further requests that the Court recommend he serve his time at FCI Greenville, Greenville, IL so he can be close to most of his children as well as the RDAP program.

Dated: February 24, 2020          Respectfully submitted,

                                  s/ Manny K. Atwal

                                  _____
                                  MANNY K. ATWAL.
                                  Attorney ID No.  282029
                                  Attorney for Mr. Bledsoe
                                  107 U.S. Courthouse
                                  300 South Fourth Street
                                  Minneapolis, MN 55415

                                  Rachael Melby
                                  Law Clerk at the Federal Defender
                                  Office and 3L at the University of
                                  Minnesota Law School